May it please the Court, good morning, Your Honors. I'm Shannon Liss-Riordan for the plaintiffs in this case. I would like to reserve four minutes for rebuttal, please. It's fine. Never works, but it's fine. We'll see how far I get. Your Honors, summary judgment was simply not appropriate in this case for many reasons. In addition to the fact that the district court found improperly found there to be no disputed facts, the Court simply applied the wrong standard. The standard with respect to whether or not these plaintiffs could be employees of Jan-Pro has now been clarified by the California Supreme Court decision and the Dynamex decision from earlier this year. The Court was ---- Sotomayor, did you rely totally on Dynamex now for your ---- success of your litigation? Well, I believe Dynamex does change the outcome here. And even under the prior standard, if for some reason Dynamex weren't to apply, the Court was distracted by two facts that shouldn't have been. One was simply that the plaintiffs were franchisees. The Supreme Court has now clarified in Dynamex not only has it set forth a different standard for how to assess the employment classification in California, but it actually cited two cases in which franchisees for cleaning companies, just like the plaintiffs here, were employees. So the California Supreme Court ---- It's an oddity in this case. I mean, it's not a complete oddity, but the cases that were cited in Dynamex, as far as I could tell, were two-tier, not three-tier cases. Well, those are the cases that were cited. That's correct. So for one thing, the Court made clear ---- Not only with respect to cleaning, but more generally. More generally. Well, remember that the Dynamex case was a case that came up ---- well, it interpreted the suffer or permit standard of Martinez, which itself was a multi-tier case. So Martinez itself was a joint employer case, and then the California Supreme Court interpreted the suffer or permit standard in the context of a joint employer case, and also said that it also applies to independent contractor misclassification. So there is no reason to assume that there would be some difference under California law when you have the multiple tiers. And as I've noted in the briefs, although it's Massachusetts, the Massachusetts Supreme Judicial Court looked at this exact issue, and in fact, in this exact same case involving JANPRO, and held that it doesn't matter if there's no direct relationship or direct contract between the alleged employer and the workers. Sotomayor, there's one thing that I found hard reading the cases, is what is it that triggers the inquiry and the burden on the putative employer? I mean, what if they sued me, you know, and said, you know, I ---- you're my employer, and now you have to prove A, B, and C. I mean, is there some ---- is there some implicit going in to face a case that's just not being articulated in these cases? Yes. And actually, it is being articulated. I think if you look at the Linton Cab case, for instance, the issue is, is that the services are performed for the alleged employer. So that's the issue. The services are performed for them. Here, we have a company, JANPRO, which holds itself out as a commercial cleaning company, and these are the workers who perform that ---- those services. So, for instance, these plaintiffs have never performed services for you, so they So, anyway, you really need Dynamex to really be successful, yes or no, but you're happy you have it. And under Dynamex, you claim that, for sure, this case has to be reversed, right? Yes. Under Dynamex, this case definitely needs to be reversed. So we have an A, B, C test. We have an A, B, C test, all right? So does A apply? Does B apply? Does C apply? On this record, which is one where summary judgment was, you know, granted, how do we assess the A, B, C test in the context of this record? So the way the A, B, C test works is that the alleged employer has the burden to prove all three prongs. So if the alleged employer cannot prove even one prong, then the workers are employees. And Dynamex says that. Any one of those prongs that you rely upon now? Well, yes. I mean, frankly, I think that JANPRO is not going to be able to satisfy any of the three prongs. But in particular, prong B, which is especially stringent ---- They're in the same business. They're in the same business. Because JANPRO holds itself out as a commercial cleaning company, if you look at their website, it advertises its locations, these so-called master franchises. Do you think we can make a determination as a matter of law that prong B is implicated here and grants summary judgment in your favor based upon prong B? Well, frankly, I do think that the plaintiffs would be entitled to summary judgment under prong B. A case that we cited from the Massachusetts Appeals Court, which has explained prong B even more specifically, is the Kerry v. Gatehouse case in which the court affirmed a grant of summary judgment to plaintiffs under prong B and looked at the types of factors that Massachusetts courts have looked at in determining whether workers are in the same business as the putative employer. One is how the company has held itself out to the public. Did that case involve, like this case, the tripartite relationship between the master franchisor, the in-between franchisor, and the underlying franchisee? That case did not. But in the Depianti v. JANPRO case, the SJC said even if there are three parts, even if there are three tiers, you just apply whatever test. They didn't apply the ABC test. They just said that you can go from the franchisee to the master franchisor, right? In the Depianti case, that's correct. They just said this is the test to apply, and then the court didn't actually  Sotomayor, there was no analysis of ABC in that case. They just said that you can't find liability on the master franchisor. That was what the Massachusetts Supreme Court said. Yes, that's correct. And many Massachusetts cases have found liability, including under prong B, on summary judgment, which was affirmed in Kerry. And there are two cases that, after the Depianti v. JANPRO case, specifically looked at this situation, a cleaning franchise company that uses intermediaries, that uses the master franchisee, and they both held the ---- Sotomayor, which cases do you have? Are there Massachusetts cases which said that you can go from the franchisee to the master franchisor under the ABC test? It was. Yes, yes. Dacosta v. Vanguard Cleaning Services. In our case? Yes. We cited that. Now, in those cases ---- Plaintiff's got summary judgment. Right. In those cases, here, as I understand it, JANPRO, your defendant, does not actually sell any services to the public. Well, it advertises that. It advertises. If you look at the website. But it doesn't, in fact, no ---- it doesn't have any transactions with clients. Well, I don't actually think that's correct, Your Honor. I think there are national accounts where it is responsible for the national accounts. Is that in your record? I didn't see it. I believe it may be in the record. I can try to find that for you. But in the other two cases in the district court in Massachusetts, was that true? I'm not ---- I thought that there were cases where the master or the, you know, the third tier was, in fact, the retailer. The Vanguard case that I just cited is the exact same fact situation we have here. You have the ---- Vanguard is the company at the top, and it had master franchisees who did the direct selling. But the Massachusetts Superior Court held that Vanguard was the employer of the franchisees, and it cited to Depianti v. JANPRO, and it said, and it applied the ABC test. There's another case that we cited as well, and also it said that the district court in the Depianti v. JANPRO case got it wrong and misapplied the SJC case, and that was also true in the Ribeiro v. System IV case, which is also in the record. That was an arbitration, or an arbitrator spent a long time analyzing this, also applied the ABC test and Depianti, and in a three-tier situation held that the franchisee was an employee. It was an arbitration decision, but it was detailed and it was confirmed by the Federal Court. Kagan, where did the Superior Court case in Massachusetts, where does that sit now? The DaCosta v. Vanguard case? Is that on appeal? No. Summary judgment was granted for the plaintiffs, and the case has recently settled. It was settled. Now, I have another structural question here. What other — in terms of — there are lots of Dynamex cases floating around this Court at this point, our Court. Do you know what the status — I know there was a case, a McDonald's case, argued in October. I don't know how close in that is. Yes. Are there — we have a priority problem. If another case is going to decide some or all of the case, we may have to wait. Well, Your Honors, I actually think this is the first case to be argued. I do know where these various cases are. So another case that I'm on, the Lawson v. Grubhub case, where there was a trial last year, that is — that has been briefed and no oral argument has been set. What about the McDonald's case? I'm sorry. The McDonald's case was argued, but then it was vacated from the — the hearing was vacated, and the case was stayed pending another decision from the California Supreme Court that I do not believe is applicable here. So the Court there took it off — took it off the docket, essentially. Really? So none of those implicated the ABC test, right? I don't think that's true. Yes. In the Salazar v. McDonald's case, the case was stayed pending an upcoming decision in a case from the California Supreme Court involving ADP, which is — which addresses the question about in an employment case where there are acknowledged employees who sued not just their direct employer, but ADP, a payroll company, the question is going to be whether or not the payroll company can be jointly liable for wage violations, which is a — it's completely so far afield from this case where Jambro — I may be wrong. My sense is that I — my sense is I agree with you. They do not implicate the ABC test or the application of them. I'm not certain exactly — The McDonald's case does. The McDonald's case does, but the Court has said that it's not going to be deciding it until after the Supreme Court decision. But, again, the difference between the McDonald's case in this case and another case that defendant cites in their supplemental brief, the Curry v. Equilon case, those are cases in which the plaintiffs are employees. And the question is not — can they sue not only their direct employer, but can they also sue another entity as joint employers? And the difference — an important difference here is here the workers are classified as independent contractors, and California law, as made clear by Dynamex, is very concerned that workers have some employer they can turn to who will be responsible for ensuring labor code compliance. And the difference here also is that JANPRO, there can be no question that JANPRO is responsible for the harms that they're alleging, because it's JANPRO's system that requires that they be classified as independent contractors, that they pay these fees to buy their jobs, that they have insurance deducted, et cetera. In the McDonald's case and in the Curry v. Equilon case and in those other type — and in Patterson v. Domino's cases, there really was a question as, well, is that company on top, that top-tier franchisor, if you will, were they really responsible for the sexual harassment or for these payroll violations that were carried out? Harrington-Domingo, Jr.: The McDonald's case was essentially a joint-employer type case. O'Connor, Jr.: Yes, that's what all three of these cases are, is what I'm saying. And this is a different kind of case. Sotomayor, Jr.: Let me back up. The joint-employment cases, I believe. Let me try to get a practical handle on this, if I may. O'Connor, Jr.: Yes. Sotomayor, Jr.: It may or may not have any impact upon how we have to decide the law here, but my curiosity gets the best of me. You have not applied for class certification yet. O'Connor, Jr.: Right. That's correct. Sotomayor, Jr.: But you plan to do that. You will do that. O'Connor, Jr.: Yes. Sotomayor, Jr.: How large a class is this? And what practical impact will it have upon JANPRO? O'Connor, Jr.: Well, I don't know offhand the exact numbers. I expect the class size would be in the hundreds. This is a large national company. We have them in other places, including Massachusetts, so I know a little bit about their size and their scope. They have a bigger operation here in California. I believe it's a class size in the hundreds. It's going to be a big one. Is this likely to put these people out of business as a practical matter? I don't believe so. I think it's in the record that their revenue, their annual revenue is $250 million. And interestingly, they count the revenues from each cleaning franchisee as part of their revenues, not the master franchisees. Sotomayor, Jr.: If you're successful, the wage order remedy will be retroactive, I guess. I don't know how far retroactive. That has to be flushed out, I guess. I don't know what the statute of limitations is. You're talking about a lot of money here, aren't you? O'Connor, Jr.: Yes. And also in the Dynamex case, of course, that was looking at a record that went back years, I think more than a decade. There are two other floating around issues that you haven't addressed, and I'll give you some extra time, but one is the preclusion question and the other is the retroactivity question. Yes. So let me talk about preclusion quickly. So Janpro was made — because of the very quirky procedural history in this case, Janpro has made an argument here that I just find makes no sense. But here's their argument. So when this case started 10 years ago in Massachusetts with a plaintiff named Giovanni Depianti, there was a race to the courthouse in which we sued Janpro in Massachusetts, and then Janpro sued for declaratory judgment against him in Georgia. Scalia, you lost the race. O'Connor, Jr.: So we lost the race, so, right. So the Georgia court of appeals ruled that he was an independent contractor, and that was before the SJC decided in Massachusetts that the three-tier system didn't affect what test you apply, just apply the test. So we think the Georgia — Kagan, to try and cut it through. O'Connor, Jr.: Yes. Kagan, Jr.: So the — ultimately, the First Circuit decided only on preclusion grounds. O'Connor, Jr.: Yes. Kagan, Jr.: And the question is, why doesn't that preclusion apply here? O'Connor, Jr.: Okay. So that preclusion does not apply, because that only applied to Giovanni Depianti. There had been no class certification. It didn't apply to anyone else. In fact, Janpro has already tried the same argument in Massachusetts and tried to claim that another Massachusetts franchisee was precluded because of what happened with the court in Massachusetts rejected that, even for another Massachusetts franchisee. That's Brandeis versus Janpro. Kagan, Jr.: Were the plaintiffs here parties to the Massachusetts case at the time that the Massachusetts — that the First Circuit was — case was decided? No, I think. O'Connor, Jr.: I'm sorry. Can you repeat that? Kagan, Jr.: Were the — the plaintiffs here were, at one time, parties to the Massachusetts case? O'Connor, Jr.: Yes. Kagan, Jr.: But they were not — but they had come out here by the time the First Circuit case was decided. Is that right? O'Connor, Jr.: No, I believe it was before. I moved to sever and move them out here in 2014, and the court acted on that in 2016 and granted it. I don't remember the exact date of when the First Circuit ruling was, but the ruling was, was that Depianti himself had raised judicata against him because of the Georgia proceedings. Kagan, Jr.: You say it's only for one person, and they're arguing some kind of a virtual representation issue there. O'Connor, Jr.: Right. Exactly. Kagan, Jr.: So that's what it comes down to, is the virtual representation. O'Connor, Jr.: Right. Which has already been rejected in Massachusetts for another Massachusetts franchisee in the case of Brandeis. Kagan, Jr.: Which I know has been rejected by the Supreme Court and by us more generally, the whole not — the whole concept. O'Connor, Jr.: Yes. And the case wasn't certified as a class action, so they can't get effect — preclusive effect on other workers not bound by that decision. Kagan, Jr.: And what about retroactivity? At some point — here's my specific question. At some point, either I think you said or somebody said that the retroactivity issue has to be decided by the California Supreme Court. Why? O'Connor, Jr.: Well, so there's a case that we cited, the Barr case, B-A-R-R, that says that it's for the California Supreme Court to decide if one of its decisions is going to be prospective only. In Dynamex, of course, the California Supreme Court itself rejected a petition for a rehearing — for modification that would have made the decision prospective only. Kagan, Jr.: California courts of appeals don't seem to be — I mean, I looked at some of those, at least one of those cases. They didn't say it's not our problem. They said it was sort of assumed by the parties, but they didn't say we can't do it. O'Connor, Jr.: Well, the other — all the courts who have addressed this so far have held that it is retroactive. So the Garcia case — Kagan, Jr.: On your theory, they couldn't hold it anyway. O'Connor, Jr.: I'm sorry? Kagan, Jr.: On your theory, they wouldn't — I guess they could hold it is retroactive, but they couldn't hold it's not retroactive. Is that the point? I mean, you seem to be saying that there are spinning wheels because the California courts of appeals can't decide anything about this. O'Connor, Jr.: That is what I'm saying, but I'm also saying that the courts that have looked at it have gone on ahead and made the decision and rejected the argument that it wouldn't be retroactive. So there's the Garcia case, the Johnson case, and now the Juarez v. Janikin case as of Friday. So no court yet has adopted an argument that Dynamex is not retroactive. Those courts, the Garcia case and the Johnson case, cited specifically to the fact that the California Supreme Court denied the petition for modification to make it prospective only. They also analyzed the law regarding when a decision is retroactive and not retroactive, and they determined that this doesn't fall under a special exception. The law in California has obviously been evolving over the years regarding the precise way that independent contractor misclassification be analyzed. The ABC test, while it's a new way of looking at it, it really stems from similar types of factors that courts have used previously. So it's an outgrowth of the Martinez case. It's an outgrowth and refinement of the Borrello case. So it's not the case. Kagan, one last question. Yes. Why shouldn't we remand this case under Dynamex rather than deciding it? I mean, is there some possibility that there are facts that might not have been developed at that point that might be developed now? Well, Your Honors, I believe the best course of action would be to vacate the decision and then remand. It would be helpful to the court below and to the parties below to have some guidance over some of these issues we briefed for you. Of course, the Ninth Circuit can decide legal issues that are addressed for the first time on appeal because of evolving case law. We did earlier move to remand this case right after the Dynamex decision came out in the hopes of efficiency, that if we could get back to the district court very quickly, that that would be preferable. But of course you're not going to withdraw that motion because it's still pending. I know your position is different today. Well, I mean, it's technically still there, but since six months have gone by and we're now here at argument, I'm hoping that this Court can cast some light to help the parties below for a remand of the case, but that we ask that you vacate the summary judgment order because that clearly can't stand and that wouldn't have even been appropriate even before Dynamex. Okay. Thank you very much. Thank you, Your Honors. Thank you for your argument. Thank you for speaking quickly, but comprehensively. Thank you. Comprehensively. Good afternoon, Your Honors. May it please the Court. Jeffrey Rosen. I want to start with Your Honors' last questions. On the issue of retroactivity, count three of the second amended complaint has wage order claims and non-wage order claims. In Garcia v. Border Transportation, in October of this year, the California Court of Appeals spoke on the application of Dynamex only to wage order claims and said that it would not apply to non-wage order claims. So we think — I understand that Plaintiff's position to be that these are all wage order claims of different kinds. If we examine count three of the complaint, we see non — the second amended complaint, we see non-wage order claims. So we're only dealing with wage order claims here. Dynamex only deals with wage order claims. Dynamex only deals with wage order claims, Your Honor. Let me ask you this question. You know, we asked that you brief Dynamex, and we know it's a fast-moving train that we're riding on here. But I looked over your papers, and it seems that, you know, you really rely primarily upon race judicata issues, retroactivity issues, claim preclusion issues. You say very little about whether or not the ABC test applies in light of Dynamex. I think maybe a page and a half is all you spoke about in your site. I think this Curry case. Why is it that you just didn't spend much time on discussing whether the ABC test applies? Your Honor, I look at that in one particular way that I think is very clear. I think that this Court can and should affirm the summary judgment ruling on, I'll call it, the old test, okay, for the non-wage order claims. Why? Why the old test? I don't understand that. First of all, we think that this Court has to do that anyway on the non-wage order claims. But why are they non-wage order claims? As I understand them, they're all basically about the violation of the—underlying each of them is the violation of the wage requirements, no? There's a claim about improper deductions from pay and timely payment of wages. Am I looking at the wrong case here? In count three. And so if you track that logic, if this Court has to review— Am I looking at the Second Amendment complaint? That's the wrong place to be looking? That's the correct place, Your Honor. And where do you see what you just said? Timely payments of all wages without improper deductions from pay, including— That's not a wage order claim? California Labor Code 2802, which in Garcia the Court stated was not a wage order claim. Well, but are you telling me that we don't address the wage order issue in this case? I think you do, Your Honor, and I want to tell you how I think you should do it. I'm anxious to hear. Okay. So first off, we look at the claims under the old test, and I think that this Court can and should affirm. And then we get to the wage order claims. And I would argue dynamics should not be retroactive, because if you actually think about it, two of our plaintiffs terminated their franchises in 2008 and 2009. That means that was a decade ago. All right. But what's California law about retroactivity in civil cases like this? That this would be one of the exceptions, that public policy and fairness would dictate that it not be retroactive. What about this notion that that has to be done by the California Supreme Court? Do you agree or disagree with that? Well, I'm not going to take a position on that other than to say that it looks like the Court of Appeal actually is willing to opine on that to a degree. But what I think you can do is say, we don't need to decide the issue. And this is what I was getting at, Judge Block. We don't need to decide the issue of retroactivity here at the Ninth Circuit here. It would certainly be unfair to Jan Proe to apply it retroactive, but we don't need to because Jan Proe has already won under the ABC test in this case. It has already won in this case in two jurisdictions. Judge Wolf did not just apply res judicata. But what about the fact that we have a different plaintiff? So the Cal Sierra v. George Reed case that we cite in our supplemental filing makes it extremely compelling that these three appellants are in privity with Mr. DiPiante. They have nothing to do with them. Everything to do with them, Your Honor. I mean, they're similarly situated, but they, other than that, no. And that's what's huge. In the Cal Sierra case, it talks about primary right. What primary right are we talking about here? And they're talking about their primary right to be free from misclassification under the ABC test, and it has already been Mr. Rosen, let me interrupt. You're a good lawyer, and I can understand why you want to avoid having to address the substantive aspects of the ABC test in light of Dynamax. It seems like you're really going way out of your way to really avoid that. And you may or may not be right. But let's assume you don't deal with retroactivity. We don't agree with you. Let's assume we don't find res judicata applies. Let's assume we don't find claim preclusion applies. How would you assess Dynamax in terms of the application of the ABC test in this case? Let me squarely address that for you, Your Honor. First of all, the A prong of the test is contractual control or control in fact. There is 200 undisputed facts in the record. I think that's factually intensive. Go ahead. That one's factually intensive. But there may be C as well, but how about B? B, I would say, under my sister's argument, if you market your trademark, if you get royalty revenue from your end products and services as a franchisor, you are per se in the same usual course of business as the actual franchisees. And the three-tier structure is important for that, but not dispositive. But it's critical. JPI's usual course of business is not commercial cleaning. None of its employees do commercial cleaning. None of them perform commercial cleaning. But they make all their money on commercial cleaning. But every franchisor with a brand that gets royalty revenue gets intellectual property revenue. And JPI actually gets its revenue from the regional master franchise owners who buy regions and license the trademark, pay it royalties. I'm not so sure that the record supports that. So, you know, are they in the same business? And then there's a wealth of cases out there that put some meat to the bones as to what constitutes being in the same business. Certainly, whether they're necessary for JPI's business is obviously a factor. And I read here from your franchise agreements that JPI gets 3% of all receipts from cleaning services performed by unit franchisees. Am I reading that wrong? You are reading that wrong, Your Honor. Why? JPI, it gets revenue in two ways. Number one, it sells regions. Yeah. Okay. It gets money for that. Number two, those regions pay it royalty revenue. Royalty revenue, which is intellectual property revenue, which comes from the gross receipts of that regional entity. But I thought that the, called top tier, your client, you're calling it intellectual property, but they're not simply selling a trademark. They're also sending, prescribing methodologies for cleaning and requiring that they be followed, as I understand it. And they're sending manuals and training and so on. No, they are not, Your Honor. When a entity- Well, I'm sorry, but I read the contracts and that's what it said. It said you have to have certain training, you have to follow our training systems, you have to use our methodologies, so on. Well, you're correct on one part of that, Your Honor. When JPI sells a region, it sells a business format. A very common form of franchising. And in that, it's not, people aren't going to pay hundreds of thousands of dollars for exclusive rights to the region and get nothing in return. Right, because they're not simply selling intellectual property. They're selling a system of cleaning. And as the Supreme Court of California said in the Patterson v. Domino's case, simply doing what a franchisor does isn't enough to trigger an employment relationship. For that purpose, which was a tort purpose. For that purpose and in general in the concept of understanding what it means to be an employer. And that's important. That's a statement by the California Supreme Court that simply being a franchisor and doing what a franchisor does is not enough. But I think that we have to be a little fact specific here. Conceptually, I may agree with you in a proper case. But this is not, I don't think, that case. Look, I'm reading the franchise agreement. Now, you tell me that they don't get 3% of all receipts from cleaning services performed by the unit franchisees. That's not the way I read paragraph 4.78. I'll look at it again. I look at paragraph 4.6 and it says JPI requires regional franchisees to sell at least 50 unit franchisees. The regionals can't just hire janitors as employees. Let's go on. You have a website that really, you know, promotes the business of JPI in many, many ways. You have these non-compete agreements. What really sort of like jumps out of the pages to me in all candor is the following thing. You have in your franchise agreement that the unit franchisees can't be in any other janitorial business. You have a lot of control that's exercised over the regional agreements. You have JPI contemplates that there are non-competes in unit franchise agreements. JPI can veto changes to regional unit agreements. I see that in paragraph 14.2. I see another paragraph which tells me JPI can step into regional franchisees' shoes and it's self-enforced terms of regional unit agreements. I see another paragraph. It says JPI shall have the right, but not the obligation, to enforce any provision of any unit franchise agreement in the event regional franchisees fail to properly and promptly do so with 30 days of receipt of a written request. Two more. Regional franchisees promises to JPI that it will enforce its agreements with the units. And last, it's a material breach of the JPI regional agreement if the regional fails to adhere to any agreement in the regional unit agreements. I can go on and on and on, but the point I'm trying to make is that don't we have to look really at the specific franchise dynamics here in order to assess whether you're dealing with a trademark situation like you would like us to do or a typical franchise situation? This seems to be a situation where JPI really does control the operation of this business, the same business. All of that, Your Honor, falls in the face of the undisputed facts that JPI does not do that. Those rights to do that are rights that a franchisor and trademark holder ---- They continue to franchise agreements. There are rights that a franchise owner and franchise trademark holder has to retain under both Federal and State law. But what is the interest? I mean, the way this is set up, the franchisor is prescribing the relationship between the regional franchisee and the people doing the work for that regional franchisee. In other words, it is requiring that the regional ---- it is saying that the regional franchisee, as I understand it, must have these sub-franchisees do the work for them rather than simply hiring employees. It says you can also hire employees, but you have to ---- but if you don't sell these franchises and have these people work as independent contractors for you, you're going to lose your franchise. So, in other words, it isn't simply ---- it is prescribing how the person who buys or purchases what seems to be more than a trademark, but it's going to operate. Meaning the regional franchisors can't simply take the intellectual property and do the work themselves. There is nothing preventing them from doing that? Yes, there is. They're going to get fired because they haven't sold enough. They're going to get ---- they have to sell a certain number of these franchises or they can't stay as an intermediate franchisee. So that is the actual model. You're correct, Your Honor. Correct. So what does that have to do with the sale of the trademark? That has to do with the sale of the trademark because the whole notion of the use of the trademark is that the end user, the end server of the use of the trademark will be performing a commercial cleaning service for customers. Right. Right. Right. So why would the person who was setting this up, if they were only interested in the trademark, care whether the so-called master franchisee, I guess that's what they call the regional franchisee, does the work by just going out and hiring a bunch of employees to wear their JADPRO uniforms and do the work according to the JADPRO system, or subcontracts to putative independent contractors? Why would that matter? If it was just the trademark they were interested in. If a regional master franchise owner wanted to do that, they could. No, they couldn't. Because if they did, they'd lose the franchise. Maybe. Well, that's what the contract says. That's all theoretical. The contract says that you have to franchise a certain amount or you're going to lose the contract. That's a right that we set up that if we need to control the use of the trademark because it's been run amok, we can definitely step in and do something about it. So, in other words, if I'm, if I'm, if I'm, it, it would not, a, a, a regional franchisee could just say, you know what, I'm not selling any of these unit, so-called unit franchisees. I'm just going to hire a bunch of employees and I'm going to pay them according, in accordance with the California wage orders. And I'm going to, but I'm going to do the work the same way, but I'm not going through this third franchisee process and that would be fine. That's correct, Your Honor. That's not why they bought the business. The contract clearly says otherwise. But that's not why they bought the business. They bought the business because they wanted to be a franchisor in their own right. In both federal and California law, the final- Am I wrong to read the contract to say that if you don't do the franchising, you're going to lose your franchise? The right is there, Your Honor. The right is there. Well, that's what it says. It says if you don't do this, you're going to lose the franchise. But the undisputed facts are such that if what you're saying to me is because we set up a sub-franchise system, we're liable? A mandatory one. If that's enough, then I would say why did the court of appeal in Curry v. Equilon Enterprises in May decide that Shell Oil, which set up- That was a joint employment situation. But it's- They didn't even analyze the ABC test. They did analyze it at the very end, Your Honor. Respectfully, Judge Block, they analyzed it at the very end. But Shell is not in the same business as the people who are pumping the gas. Well, they've got a big branded sign there at the gas station, and they've got- People are pulling up thinking they're getting gas from Shell. Did they tell the gas station how they have to relate to the people who pump the gas? I'm sorry, Your Honor. Did they tell the gas station how they're supposed to relate to the people who are pumping the gas? No. And it's undisputed in our record that JPI does not tell any unit franchisee how to do anything. We have no control. But it does tell them that you can't do the work simply by hiring employees? We're not involved with the unit franchisee. The regional master franchise owner has a contract with the unit franchisee, and they barely interact with them. We don't interact with the unit franchisee. If you apply the ABC test to JPI, there are undisputed facts that we don't control them and that they are independently established from JPI. And then when it comes to the usual course of business, I don't see any- That's not the test under Dynamex anymore. You may be right under Borrello or Martinez, arguably, but you have Dynamex to deal with. We have to deal with Dynamex. And those were the A and the C prong of Dynamex, Your Honor. And I would argue that Judge Alsup had a detailed analysis that fits right into the A prong. In the Curry case? No, Judge Alsup in our case below, summary judgment below, had a detailed analysis that fits right into the A prong. And when it comes to the C prong, I would say this. How is it — how is it possible that JPI wouldn't be in the same usual course of business with Dipianti and that he wouldn't be in an independently established trade with GPI, but yet somehow Roman, Aguiar, and Vasquez are somehow in JPI's usual course of business? That case, Cal Sierra v. George Reed Development, makes clear that where the same primary right is at stake and their due process rights have been protected by the same lawyers- Let me ask you something practical about it. Would you consider possibly the right thing to do here is to send it back and let the district court, you know, really wrestle with A, B, C in light of Dynamex? I don't think they need to, Your Honor. First of all, my sister did not move for summary judgment below. Well, but we gave — well, you know, I think about that. You're certainly entitled to be heard on the issue because we could grant summary judgment to the non-moving party as long as you have fair notice. By asking you to brief the issue, we've given you more notice than, you know, we could possibly give you. And all you rely upon is Curry. That's all you have to say to support your thesis. Well, Curry is a critical analysis, and I don't just rely on Curry. The Georgia Court of Appeals went through a factual analysis of why JPI did not — did satisfy the B prong under — for Dipianti, went for a detailed analysis of why JPI satisfied the C prong for Dipianti, and I would ask this Court, how is it possibly fair to JPI? For 11 years, it's been litigating this issue under the ABC test, and it has prevailed in three different courts. Well, should we certify to the California Supreme Court the retroactivity question? Should you certify to the California Supreme Court the retroactivity question? Yes. That would not be a bad thing to do, but I don't think it's necessary. I think that you can affirm Judge Alsop on the non-wage order claims under the old test, and I think when it comes to the ABC test — By the way, do you — I'm not sure about this, but do you think Dynamics of Play is only to wage orders or to wage claims? Wage order claims.  Wage order claims. Not to wage and error claims more generally. I don't know. That's my — I honestly haven't looked at it. That's my view of it, and that's the way Garcia — I want to go back to what he says before, because I become a little irritated when somebody tells me that I'm not reading the contract right. Regional franchisee agrees to open the region for business on the latest of September 1st, the actual date. During the initial 12 months from the date of opening, it will sell no less than 15 franchise units. Thereafter, regional franchisee agrees that it will use all reasonable efforts to sell no less than 10 franchise units per year. In the event they do not sell the prescribed number of franchise units, they shall have the following options. They can cancel the exclusivity right, and they can begin it on their own, or they can cancel it and do something else. So it's absolutely mandatory, and what you said is absolutely untrue, and I suggest that you not do that again. Well, Your Honor, I apologize. What I was trying to say was that the right of control is there. The right of control is there, okay? It's a contractual obligation that they do this. And you're saying they can just decide not to enforce the contract. Is that your point? There is also undisputed facts in the record that no regional master franchise owner was ever held to a quota, and our two regional master franchise owners here, C&I and New Venture, were never held to a quota, okay? So the actual, actual stepping in and being involved in that business— I'm not talking about stepping in. I'm talking about the fact that the methodology of operating through these putative independent contractors rather than through one's own employees is absolutely mandatory under the contract. That is correct, Your Honor. Okay, thank you. Your time is up. Thank you. Thank you very much. Are you only appealing the wage order aspect of this, or are you not? There's nothing else before this, is there? Yes, that's right, Your Honor. And you're right. All of the claims that we brought fall under the wage order, so Dynamex would be applicable. Well, if they fall under wage orders, they fall under wage statutes that aren't necessarily in the wage orders. Well, the way— How does that matter? Well, the way that's been looked at is that the wage orders have certain various requirements that are similar to the requirements of the wage statutes. So I believe what they were talking about in the Dynamex case was wage statutes that subsume the types of protections that were in the wage order, since you can't sue under a wage order directly. So all of the claims that we brought are subsumed under the wage orders. And in the cases that have looked at this so far, the Johnson case, for instance, agreed that all of these same types of claims that we brought here fall under the wage orders, and Dynamex would apply. The 20 — I just want to mention quickly on the 2802 expense reimbursement claim, that does fall under the wage orders also, because the wage order would require the reimbursement for — or that the employer pay for tools and equipment, which is similar to what reimbursement under 2802 holds. Now, in the Garcia case, the appeals court did say Dynamex only applies to the wage orders, but it didn't even have a 2802 claim in front of it, so it was dicta when it just seemed to assume that wasn't a wage order claim. It didn't really look at it. No one had even argued it in that case. So — Kagan. But is it correct that Dynamex only applies to wage orders as opposed to wage-an-hour claims that have a different source? No. So in Dynamex itself, there were wage-an-hour claims, but the way it was described was that these were rights that were also protected under the wage orders. So it's the same as here. The claims themselves obviously are under the wage-an-hour laws, the labor code claims. That's where you bring claims. You can't bring them directly under the wage orders. So Dynamex — and again, those were the claims that were there in Dynamex. I believe there are some more general California wage laws that are not necessarily dependent on the particular wage orders. And that's what I'm trying to get at. That might be true, but the claims that we brought here are all related to rights protected by the wage orders. And then also, just another thing, just stepping back, if you look at the Dynamex decision, an incredibly forceful, unanimous, 82-page decision, the Supreme Court said, we're deciding now for the issues that are before us. And in a footnote said, the parties didn't brief 2802, so we're just not specifically deciding that. But if you read the decision and get the gist of what the Supreme Court said, it made a monumentally strong statement about how important it is for workers to have their rights protected. So it didn't say, don't apply any of this to anything else. It said, look at the purpose behind the laws in making the decision. And for right now, we're going to at least say that for the wage orders, this is the test to apply. Kagan. Thank you very much. Thank you. Can I respond to one other point about the other? All right. Go ahead. Quickly. Very fast. Okay. So on this issue, JANPRO set up and required the whole system by which these workers would be independent contractors. It decided. It had a schedule of how much the workers had to pay for their jobs. It wrote the contracts between the workers and the master franchisees. What evidentiary significance of any is there if that these rules were seem to have been enforced in absent and not enforced a good deal of the time? It makes no difference at all, because under both the Dynamax ABC test and the prior law, Borrello and Aiella, the issue is the right of control. A defendant can't say, oh, we have a right of control in the contract. But just ignore that. We never enforce it. Master contracts seem to say that certain things are supposed to be in the union contracts, but they're not. No. Okay. So there are — there's a contract between the workers and the master franchisees, which JANPRO wrote, and it — But JANPRO says that's not necessarily — my understanding is you can either use the one we wrote or another one, as long as we approve it. And then some of them apparently are not the ones they wrote. They don't seem to have some of the clauses, like either the non-compete clause or the third-party beneficiary clause or something. Well, the master franchisee has to get permission from JANPRO if it wants to alter its draft template, but JANPRO, there's no getting around the fact that it is the architect of this whole system, by which the workers must perform the work as independent contractors. They must pay for their franchises. JANPRO gets a percentage of that, as you've noted. So this isn't a case where anyone is paying, like, a flat fee to — to lease or buy intellectual property. This isn't like cab drivers who are paying a flat rate to lease their cab. The company is getting a percentage off of the workers' labor. Thank you. Thank you very much. Thank you, Your Honor. Thank you. Thank all of you for your arguments. They were useful and an interesting case. Vasquez v. JANPRO Franchising International is submitted, and we are in recess. Thank you, Your Honor.
judges: Gould, Berzon, Block